IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 2, 2025

**IN RE QUINTON A. ET AL.**

**Appeal from the Juvenile Court for Hamilton County
No. 310647, 310648 Robert D. Philyaw, Judge**

_____

**No. E2024-01678-COA-R3-PT**

_____

Father appeals the trial court's findings that (1) termination of Father's parental rights is supported by the grounds of substantial noncompliance with a permanency plan and failure to manifest an ability and willingness to assume custody, and (2) termination is in the children's best interests. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Jeffrey Kelle, Dunlap, Tennessee, for the appellant, Quinton A., Sr.[1]

Jonathan Skrmetti, Attorney General and Reporter; Allen T. Martin, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Jeff Davis, Hixson, Tennessee, Guardian ad Litem.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Quinton A., Jr. ("Son")[2] was born to Respondent/Appellant Quinton A., Sr.

---

[1] The appellant's brief was filed by his prior counsel, Dorothy Mainord. After the brief was filed, Ms. Mainord withdrew, and Mr. Kelle was appointed as counsel.

[2] In cases involving the potential termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

("Father") and Respondent Tabatha S. ("Mother") in January 2018.[3] Based on Father's incarceration and Mother's admission that she could not care for Son, the Hamilton County Juvenile Court ("the trial court") placed Son into the custody of his parental grandmother ("Grandmother") in April 2018. Kayla A. ("Daughter") was born in January 2020. Four days later, Daughter was also placed into Grandmother's custody as a result of Mother's drug use while pregnant.[4]

Shortly thereafter, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") petitioned the trial court to prohibit the parents from having unsupervised contact with the children. The parents subsequently agreed with DCS's petition. The trial court entered an order prohibiting the parents from residing with the children or having unsupervised or overnight visitation until they provided proof of the completion of certain requirements.

In August 2022, Grandmother filed a petition for divestment of custody, stating that her health prevented her from continuing to care for the children. At the hearing on Grandmother's petition, Mother requested that the children be placed in her custody. Finding probable cause that the children were dependent and neglected, the trial court denied Mother's custody petition, granted Grandmother's divestment petition, and placed the children into the temporary custody of DCS on November 1, 2022.

DCS foster care worker Ashley Berry developed a permanency plan with the goal of returning the children to the parents. The plan noted that Father "is involved and willing to [do] whatever he needs to do to get his children back." Father was required to (1) maintain a bonded relationship with the children, provide proof of completing a DCS-approved parenting course, remain in contact with DCS, and attend Child and Family Team Meetings; (2) provide proof of legal income, obtain legal employment for six consecutive months, and pay child support; (3) provide DCS with a copy of his driver's license, car insurance, and vehicle registration, obtain residential stability for six consecutive months, provide a safe and appropriate home for the children, and provide DCS with a copy of a rental agreement in his own name; (4) abstain from alcohol or drug abuse, avoid those known to use or abuse drugs or alcohol, and submit to random drug screens; (5) not associate with known criminals, not allow criminal activity in the home, resolve any current legal issues, and not incur any new criminal charges; and (6) complete a clinical parenting assessment, a mental health assessment, and an alcohol and drug assessment and follow all recommendations. The plan was ratified by the trial court in February 2023 and signed by

---

[3] Mother has not appealed the termination of her parental rights, so we will discuss her involvement in the case only as necessary.

[4] Father testified to voluntarily signing the birth certificates of both children. Father denied being the biological father of Daughter, but explained that he did not request DNA testing because she was already in Grandmother's custody. No legal issue has been raised regarding Father's paternity, either in the trial court or on appeal.

Father.[5]

Eventually, DCS filed a petition to terminate the parents' rights to the children on January 4, 2024. The petition was amended on January 12, 2024. As to Father, DCS alleged the grounds of (1) persistent conditions, (2) substantial noncompliance with a permanency plan, and (3) failure to manifest an ability and willingness to assume custody.[6] DCS further alleged that termination of Father's parental rights was in the children's best interests.

The matter was heard on July 15, 2024. At the time of trial, Father was incarcerated for a violation of probation.[7] Father testified that when he was released from incarceration, there would be no further legal issues outstanding. Father stated that he would be ready to assume custody of the children immediately upon his October 2024 release from jail.

Father admitted that none of the permanency plan requirements had been completed. Father stated that he never stopped working toward completing the requirements, but would instead be "off and on with them." Father agreed that it was reasonable for him to have to complete the requirements set out in the plan prior to regaining custody of the children.

Father testified that he completed a parenting assessment and began, but did not complete, the recommended parenting classes. Father completed an alcohol and drug assessment and stayed for approximately twelve days in a rehabilitative facility. Father explained that he was completing alcohol and drug, mental health, and anger management classes while in jail. Father stated that all of the plan requirements would be met by the time he was released from incarceration in October 2024, explaining that the reason the requirements were not completed prior to his incarceration was that he did not have assistance setting up the required classes and assessments. But Father admitted that DCS scheduled at least one appointment and provided him with transportation; Father also admitted that he stopped communicating with Ms. Berry around when the children were placed in DCS custody.

Father explained that he did not have housing in his own name. Father lived with Grandmother prior to his incarceration, and he would live with his grandmother when he was released. Father explained that he would occasionally show up late for or leave early from visitations due to difficulty getting time off when he was employed collecting trash. Father testified that he was subsequently employed at a car dealership from November 2023 until his April 2024 incarceration. Father stated that he has a job waiting for him when he is released in October 2024.

---

[5] A second permanency plan was ratified in December 2023 and a third plan was ratified in May 2024. These plans were not reviewed with the parents as Ms. Berry was unable to contact them. Father's responsibilities remained the same across all three plans.

[6] At trial, DCS announced that it was striking the ground of persistent conditions.

[7] Father testified that he was placed on probation following a conviction for theft and possession of methamphetamine in January 2023.

Father testified that he first began using marijuana as a teenager; he began using methamphetamine around the time the children were placed into DCS custody in 2022. Father explained that he submitted to drug screens at visitation. Father testified that he was not told which substances he tested positive for, but stated that he was not using methamphetamine at the time and stopped using marijuana after his third visit with the children.

Effective March 1, 2023, Father was ordered to pay $50.00 per child in child support each month.[8] In June 2023, Father was also ordered to pay $25.00 per child in child support arrears each month, with the arrearage dating back to DCS's November 2022 motion to set support. Father stated that child support was being garnished from his wages and his income taxes. According to the Non-Custodial Parent Payment Summaries provided by DCS, Father paid $61.53 per child in March 2023, $73.06 per child in April 2023, and $11.53 per child in May 2023, for a total of $146.12 per child over the course of three months. Another $460.01 per child was withheld from his income tax in January 2024. Despite these payments, Father was found in willful contempt of the child support order in December 2023, when his arrearage balance reached $653.88 per child. Father was incarcerated for the contempt from April 10 to June 14, 2024, which the trial court accepted as a full resolution of Father's outstanding arrearage.

Ms. Berry testified that the permanency plan responsibilities were not changed after the first plan was created in November 2022, because no progress was being made. She stated that Father had not provided proof of housing in his name, proof of income, or a transportation plan in light of his not having a driver's license or vehicle. Ms. Berry stated that it was difficult to contact Father prior to his incarceration, explaining that none of the approximately ten different phone numbers she had for Father were in service and Father did not check his email.

Ms. Berry testified that she submitted a parenting assessment request for Father, and Father completed the assessment in January 2023. However, Father did not complete the parenting classes or attend the alcohol, drug, and mental health services recommended after the assessment. Ms. Berry explained that Father did not complete any of the first three alcohol and drug assessments that she scheduled for him, but did complete the fourth scheduled assessment in December 2023. Father did enroll in a rehabilitative facility as recommended, but left after only twelve days due to an altercation with another patient. Father then sought treatment at another provider but left when his insurance coverage ended. Father also completed a few mental health assessments but did not follow the recommendations. Ms. Berry testified that she could not arrange services for Father while he was incarcerated.

---

[8] The order indicated that $11.53 per child would be garnished from Father's wages each week, with Father responsible for the remaining balances.

Ms. Berry explained that Father was granted two visits with the children each month, with each visit scheduled for two hours. The first visit was in December 2022 and the last visit was in June 2023. The children were transported two hours one-way to the visits. But Ms. Berry testified that Father arrived late or left early for approximately half of the visits. Ms. Berry also explained that Father would be on his phone during the visits and would not really be engaged with the children. She stated that the children would get very upset when the parents would miss visitation or leave early: the children "would cry and then the tantrums would start once they got back to the foster home and they would last for days." Indeed, both children regressed in potty training after visitation was missed or cut short.[9]

Ms. Berry explained that visitation was suspended in July 2023 as a result of failed drug screens and the general lack of progress toward completion of the plan requirements.[10] Father failed drug screens in December 2022, March 2023, April 2023, and May 2023, testing positive each time for amphetamine, methamphetamine, and marijuana.[11]

Ms. Berry testified that the children were placed together in their current foster home in July 2023.[12] Ms. Berry explained that the home is pre-adoptive and the children "have really bonded with the foster parents and the other children in the home." She testified that the children do not ask after the parents and Son often asks when he will get to be adopted. Ms. Berry opined that removing the children from the foster home would result in psychological harm, particularly in light of the parents' continued drug use issues and lack of financial support for the children.

Franny B. ("Foster Mother") also testified. She explained that both children had some serious health issues remedied when first placed in her home, but that the children are now happy and healthy. Both children receive individual therapy and Son receives speech therapy at school. Foster Mother explained that currently seven children reside in the home, ages twelve, eleven, six, five, four, three, and two. Four of the children have been adopted and three, including Son and Daughter, are still in foster care. The children call the foster parents "Mommy" and "Daddy" and get along well with their foster siblings. Foster Mother explained that two other sibling pairs were adopted while the children were in her home, prompting Son to ask when it will be his turn to be adopted. Foster Mother testified that she believed removing the children from her home would be "devastating."

---

[9] Ms. Berry testified that these potty-training issues mostly ceased around the time visitation was suspended.

[10] Father testified that he knew the requirements for having visitation reinstated—to attend a drug assessment and pass two drug screens—but did not complete these requirements.

[11] No further drug tests were performed after the December 2023 alcohol and drug assessment.

[12] Prior to the current foster home, the children were placed together in a different foster home. The children's placement changed when the first foster family moved, not as the result of anything to do with the children.

She stated that the children have mentioned Grandmother and their cousins but have not asked to see any family members. Foster Mother testified that she would be willing to maintain these relationships if the children were adopted.

The trial court entered its order terminating the parental rights of both parents on October 15, 2024. As to Father, the trial court found clear and convincing evidence of the grounds of substantial noncompliance with a permanency plan and failure to manifest an ability and willingness to assume custody. The trial court also found clear and convincing evidence that terminating Father's parental rights was in the best interests of the children. It is from this order that Father now appeals.

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

Because of the high burden of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has explained:

To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### III. ANALYSIS

Any termination of parental rights appeal involves two overarching issues: whether the trial court correctly found clear and convincing evidence of at least one ground to terminate the parent's rights, and, if so, whether the court correctly found clear and convincing evidence that termination of the parent's rights is in the children's best interests. *See In re Carrington H.*, 483 S.W.3d at 525–26.

### A. Grounds for Termination

Here, the trial court terminated Father's parental rights on the grounds of (1) substantial noncompliance with a permanency plan, and (2) failure to manifest an ability and willingness to assume custody of the children. Father disputes both grounds.

### 1. Substantial Noncompliance

- 7 -

Under Tennessee Code Annotated section 36-1-113(g)(2), parental rights may be terminated based on "substantial noncompliance by the parent or guardian with the statement of responsibilities in the permanency plan." Proof that a parent "has not complied with every jot and tittle of the permanency plan" is not sufficient to support a finding of substantial noncompliance and "[t]rivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, DCS must first demonstrate "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child[ren] to be removed from the parent's custody in the first place[.]" *Id.* (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). DCS must then establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)). Whether a parent's noncompliance is "substantial" is a question of law reviewed without a presumption of correctness. *In re Markus E.*, 671 S.W.3d at 473.

The permanency plan developed in November 2022 contained seven major responsibilities for Father to complete. Father was required to (1) maintain a relationship with the children; (2) pay child support; (3) obtain residential and employment stability; (4) abstain from drug use; (5) not incur any new criminal charges; (6) follow all recommendations from a clinical parenting assessment, a mental health assessment, and an alcohol and drug assessment; and (7) remain in contact with DCS. Father testified at trial that he was aware of the plan's requirements and believed it reasonable to condition his ability to regain custody of the children on his completion of these requirements. We agree that the responsibilities set out in the permanency plan were reasonable and geared toward remedying the conditions that led to the removal of the children—namely Father's criminal conduct and the children's exposure to illegal drugs.

Father emphasizes on appeal that he made "efforts to comply with the [p]ermanency [p]lan through resources available to him, even while incarcerated," and "completed steps towards the goals of the permanency plan to move toward stability." We certainly credit Father for the progress made toward completion of the plan. The testimony established that Father had housing and employment prior to his incarceration and had housing and employment lined up for when he was released. Father also attended visitation before it was suspended and provided some child support through wage garnishment and tax interception prior to his incarceration. And Father completed all three assessments required of him. Like the trial court, we hope that Father does not think taking these steps to better himself and his circumstances was a waste of his time.

However, this effort does not preponderate against a finding of substantial

noncompliance.[13] At the time of trial, visitation had been suspended due to the parents' continued drug use and Father had not seen the children in over a year. Father had not met his child support obligation and continued to test positive for methamphetamine, amphetamine, and marijuana. Father was also convicted of theft and drug possession during the custodial period and was incarcerated at the time of trial for violating the terms of his probation. Even prior to his incarceration, Father admitted that he was not keeping in proper contact with DCS. This lack of communication also resulted in Father's failure to provide a transportation plan or proof of income. And while Father completed the assessments assigned by DCS, he failed to follow the subsequent recommendations as required. *See **In re Travis H.**, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at \*11 (Tenn. Ct. App. May 5, 2017) (finding substantial noncompliance where the parent completed the required assessments but did not follow the recommendations from the assessments). We do not agree with Father that these significant failures constitute mere technical deviations from the plan's requirements. Instead, the evidence demonstrates that Father failed to apply meaningful effort toward a number of the plan's most important requirements, resulting in substantial noncompliance with the permanency plan. We therefore affirm this ground.

## 2. Failure to Manifest an Ability and Willingness

The trial court also determined that Father failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee Code Annotated section 36-1-113(g)(14). Parental rights may be terminated under this section when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or

---

[13] We note that while the statute requires a finding that the parent is in substantial noncompliance with a permanency plan, the trial court found instead that "Father has not substantially complied with the Permanency Plan." Still, this misstatement does not imply that the trial court applied the correct standard when viewed in light of the trial court's discussion of Father's noncompliance with the responsibilities set out in the plan. *Cf.* **In re Ethan W.**, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at \*7 (Tenn. Ct. App. Jan. 26, 2023) (affirming the trial court's finding as to this ground despite the reference to "substantial compliance" when it was "apparent from the court's analysis that it applied the appropriate standard"), *perm. app. denied* (Tenn. Apr. 20, 2023). Moreover, we note that the phrase "did not substantially comply" has been used by the Tennessee Supreme Court in this context *See, e.g.*, **In re Markus E.**, 671 S.W.3d at 474 (considering "the question of whether Mother did not substantially comply" with the requirement to obtain a mental health requirement); **In re Carrington H.**, 483 S.W.3d at 537 (affirming this ground where the trial court found that the parent "failed to comply in a substantial manner" and "failed to comply substantially" with the permanency plan requirements). Thus, while we encourage trial courts to hew closely to the language of the termination statute in their findings, we conclude that the trial court's use of imprecise language is not a basis to vacate this ground.

psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince *either* an ability *or* a willingness to assume custody of the child. ***In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020). Our analysis of a parent's ability "focuses on the parent's lifestyle and circumstances," while willingness involves the parent's attempts "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child[ren]." ***In re Cynthia P.***, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citations omitted).

The second element requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Although "risk of substantial harm" is not defined by the statute, this Court has provided examples of situations resulting in such a risk, including "forcing a child to begin visitation with a near-stranger," "placing a child with a parent who engaged in repeated criminal conduct that required incarceration," or returning a child to "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence[.]" ***In re Brianna B.***, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases).

Here, the trial court found that Father's failure to pay child support as ordered established his unwillingness to assume financial custody of the children. Father's continued use of illegal drugs despite his admitted knowledge that abstaining from drug use was a requirement for both resuming visitation and regaining custody also indicates that Father was unwilling to assume physical custody of the children. *See **In re Maya R.***, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (finding unwillingness based on the parent's failure to complete requirements of the permanency plan). Furthermore, Father was rendered unable to assume either physical or financial custody of the children at the time of trial due to his incarceration. These facts, taken together, clearly and convincingly prove the first prong of this ground for termination.

As to the second element, the trial court found that placing the children in Father's custody would pose a risk of substantial psychological harm, based on the potential exposure to methamphetamine or other illegal drugs while in his care. There was also testimony that the children became distressed after unsuccessful visits with the parents, to the point where they regressed in potty training—an issue mostly resolved when visitation ceased. And Foster Mother testified that being removed from her home would be "devastating" to the children based on their bonds with the foster parents and siblings. These facts indicate a likelihood that the children would indeed suffer from substantial psychological harm if returned to Father's care.

- 10 -

We conclude that there was clear and convincing evidence both that Father was unable and unwilling to assume custody of the children and that placing the children in Father's custody would pose a risk of substantial harm. This ground is also affirmed.

## B. Best Interests

Because we have determined that at least one statutory ground for terminating Father's parental rights has been proven, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Father's rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of children include, but are not limited to, the following:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
> (I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
> (J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (directing the court to "consider all relevant and child-centered factors applicable to the particular case before the court").

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667 (citations omitted). As such, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White*, 171 S.W.3d at 194). In considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at

878). Here, the trial court found that sixteen factors weighed in favor of termination.[14] As "there exists a significant overlap between some factors," our review of the children's best interests is "based on the overarching themes within the list of twenty factors." ***In re Chayson D.***, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We turn first to those factors related to the children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the children's need for stability), (B) (involving the effect of a change in caretakers on the children's wellbeing), (D) (involving the security of the parent-child attachments), (E) (involving visitation), (H) (involving the children's attachment to another parent-figure), (I) (involving the children's relationships with others), (T) (involving the effect of the parent's mental and emotional fitness on the children). Here, the children had not seen Father in over a year due to the suspension of visitation. Father acknowledged that he was aware of, but did not complete, the minimal requirements for visitation to be resumed. The children have been placed in their current foster home for roughly the same amount of time. Ms. Berry and Foster Mother both testified that the children did not ask after Father or any other biological relatives. Instead, the testimony established that the children are bonded with their foster family, calling the foster parents "Mommy" and "Daddy" and asking when they will get to be adopted. Ms. Berry and Foster Mother both also testified that removing the children from the foster home and returning them to Father's custody would have a negative effect on the children, based in part on Father's continued drug use and in part on the children's bond with the foster family. These factors weigh in favor of termination.

Next, we address those factors involving the physical environment of the children and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the children's fear of the parent's home), (G) (involving whether the children's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), (R) (involving the health and safety of the home). These factors are difficult to discuss for two reasons. First, the children have spent little to no time in the same home as Father: Son was removed into Grandmother's custody at three months old and Daughter was placed directly into Grandmother's custody at five days old.[15] As such, it is unlikely that the children have any fear or trauma associated with Father's home. Second, Father was incarcerated at the time of trial, preventing any evaluation of Father's home or its inhabitants by DCS. By the same token, however, these facts also establish that Father has failed to provide a safe and stable

---

[14] The remaining four factors, (B), (F), (G), and (N), primarily relate to the parent's home; the trial court ruled that these factors were not applicable as Father was presently incarcerated. We will nevertheless discuss these factors as relevant.

[15] While there was some testimony at the November 2022 hearing on Grandmother's motion for divestment of custody that the parents had been residing with Grandmother and the children, such cohabitation was in violation of the trial court's earlier order and so does not weigh in Father's favor.

home for the children in the past and that Father has not shown a commitment to providing such a home in the future. Similarly, Father's continued drug use reflects negatively on the health and safety of any future home. On the whole, these factors weigh in favor of termination.

We turn next to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the children's basic needs). As discussed, *supra*, Father has made use of the resources made available by DCS to some degree. DCS scheduled the various assessments Father was required to complete, and Father did eventually complete all three assessments. Father did not, however, follow the recommendations of these assessments. Father also did not remain in contact with DCS as required. Nor did Father show any urgency in addressing his use of illegal drugs, which was a major concern that led to DCS gaining custody of the children. By his own testimony, Father only began using methamphetamine *after* the children were placed into DCS custody. And although Father testified that he was not using methamphetamine at the time and had eventually stopped using marijuana after his third visit with the children, Father was not able to pass a drug test even in December 2023. This continued drug use, in the face of the removal of the children, the suspension of visitation, and the child support arrearage balance, does not indicate that Father has made a lasting adjustment of circumstances enabling him to consistently meet the children's needs. These factors also weigh in favor of termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child[ren]." Tenn. Code Ann. § 36-1-113(i)(S). We acknowledge that Father successfully paid the $50.00 per child per month support ordered by the trial court for March and April 2023 through garnishment of his weekly paychecks. And it appears that eventually, Father's January 2024 income tax refund went toward paying down the arrearage balance. Yet no child support payments were made after the children were placed into Grandmother's custody or after the children were placed into DCS custody until the trial court entered its March 2023 order. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); ***State ex rel. Hayes v. Carter***, No. W2005-02136-COA-R3-JV, 2006 WL 2002577, at *2 (Tenn. Ct. App. July 6, 2006) ("It is well settled in Tennessee that biological parents must, as a general matter, support their children until they reach the age of majority. . . . The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists[.]" (citing T.C.A. § 34-1-102(a), (b) (2001); ***Smith v. Gore***, 728 S.W.2d 738, 750 (Tenn. 1987))). Nor were any payments made after the January 2024 tax interception. This factor therefore weighs in favor of termination.

- 14 -

In summary, Father has not seen the children in over a year based on his continued use of illegal drugs and continued criminal conduct. This same behavior resulted in Father being incarcerated at the time of trial and without a safe and stable home to which the children could return. While Father has taken some steps toward bettering his circumstances that could indicate a desire to regain custody of the children, his failure to take other steps within his control suggests a lack of commitment. On the other hand, the children are in a pre-adoptive home where they have bonded with their foster family and received necessary medical care. The children do not have a meaningful relationship with Father, having had little contact with him in their short lives, and Son in particular has made clear his desire to be adopted into Foster Mother's family. *Cf.* **In re Addalyne S.**, 556 S.W.3d at 795–96 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]"); **In re Jaydin A.**, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *8 (Tenn. Ct. App. Dec. 12, 2019) ("Although no proof was specifically presented that a change in caretakers would be harmful to the child, common sense dictates that removing a child from the only family she has ever known and placing her with a stranger who has historically chosen to put his own desires ahead of the child's needs would cause harm to the child."). Under these circumstances, the trial court did not err in concluding that termination of Father's parental rights was in the children's best interests.

## IV. CONCLUSION

The judgment of the Hamilton County Juvenile Court is affirmed, and this matter is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Quinton A., Sr., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 15 -